PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| AMARADO OIL COMPANY, LTD., | ) | |
| | ) | CASE NO. 5:12cv627 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| DEAN DAVIS, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | **MEMORANDUM OF OPINION AND** |
| | ) | **ORDER** [Regarding ECF No. 47] |

This matter is before the Court upon the Davis Defendants'[1] Motion to Dismiss All But One Count of the First Amended Complaint.  ECF No. 47.  Plaintiff Amarado Oil Company ("Amarado") responded (ECF No. 66) and the Davis Defendants replied (ECF No. 75).  For the reasons that follow, the Court grants the Davis Defendants' motion in part and denies it in part.

## I. Background

### A.  The Parties

Amarado is a Texas Limited Partnership that purchased mineral rights to the Utica Shale formation, a mineral rich shale lying several thousand feet below the surface of the eastern portion of Ohio.  ECF No. 46 at 2-3, ¶¶1, 10.  The Davis Defendants ("Davis") are each engaged in the business of either drilling oil and gas wells, leasing oil and gas wells, maintaining oil and gas wells, or all the foregoing in several Ohio counties.  ECF No. 46 at 3, ¶9.

---

[1]  The "Davis Defendants" include Green Gas Company, Noble Gas, An Car Oil Company, *aka* An Car Wells, S&D Producing and Davis Frac Tank & Supply, sole proprietorships of the individual Dean Davis; Dean Davis; and Roger Proper, Jr., Trustee of the Dean Davis Dynasty Trust U/A.  ECF No. 46 at 2, ¶¶3, 4.

(5:12cv627)

Defendant Daniel Plumly is an attorney with Defendant Critchfield, Critchfield & Johnson ("CC&J"), an Ohio law firm that represented Davis in the underlying transaction that is the subject of this dispute.  ECF No. 46 at 2, ¶¶6, 7.

### B.  Facts as Alleged by Amarado

#### 1.  The Contract

Amarado and Davis entered a letter agreement dated June 15, 2011 whereby Davis would, at the option of Amarado, sell its Utica shale sub-Clinton leaseholds to Amarado for $1,000 per net mineral acre.  ECF No. 46 at 3, ¶11.  The June letter also provided that Davis would maintain any lease for five years "on all acreage confirmed and delivered" to Amarado. ECF No. 46-1 at 1.  On July 27, 2011 Amarado sent notice of its intent to exercise the option and purchase Davis' leaseholds.  ECF No. 46 at 3, ¶12.

Amarado came to learn that Davis' records and file-keeping regarding its leaseholds were "disorganized and confusing." ECF No. 46 at 3, ¶13.  Consequently, Amarado expressed its reservations about Davis' title to its leasehold estates—specifically whether Davis' leaseholds contained rights to explore, drill and develop the sub-Clinton strata and whether existing leases were held by production.  ECF No. 46 at 3, ¶13.

On September 1, 2011 Defendant Plumly and his law firm CC&J hosted a meeting to discuss Amarado's concerns about Davis' records and to alleviate Amarado's concerns about title matters in an attempt to facilitate the purchase of the sub-Clinton leaseholds.  ECF No. 46 at 3-4, ¶14.  During the course of the meeting, Plumly "pulled a representative of Amarado into a separate room and indicated that CC&J would counsel Amarado regarding title matters." ECF

2

(5:12cv627)

No. 46 at 4, ¶15.  Plumly then prepared a letter agreement for the parties dated September 1, 2011, which both Amarado and Davis signed.  ECF No. 46 at 4, ¶15.

The September letter modified the June 15, 2011 and July 27, 2011 letter agreements. ECF No. 46 at 4, ¶18.  It indicated that Davis would cause its attorney Plumly and CC&J to provide legal services to Amarado for legal consultation regarding title issues and legal work for curing title defects.  ECF No. 46 at 4, ¶18.  Amarado was to pay CC&J a legal fee, contingent upon the transfer of Davis' sub-Clinton leaseholds, of $125.00 per net mineral acre.  ECF No. 46 at 4, ¶18.  Additionally, the September letter provided a "Final Determination Date" of December 31, 2011, for Amarado to accept or reject a lease.  ECF No. 46-1 at 4.

Unbeknownst to Amarado, a substantial portion of the leaseholds had a specific catastrophic title defect caused by a term reservation of the mineral estate contained in deeds to a company known as the Franklin Real Estate Company (the "Franklin defect"), which defeated Davis' title as it related to the sub-Clinton rights.  ECF No. 46 at 4, ¶16, at 7, ¶34.  These leases were deemed "failed leases." [2]

### 2.  The Course of Performance

Amarado defines the contract as the three letter agreements, which it attaches to the First Amended Complaint, and the course of performance.  ECF Nos. 46 at 6, ¶27; 46-1.  During the course of performance of the contract, the sub-Clinton leaseholds were conveyed from Davis to Amarado in a series of separate assignments beginning with September 28, 2011 and ending December 30, 2011.  ECF No. 46 at 6, ¶¶27, 29.  In total, Davis received $6,036,210.00 for the

---

[2]  Davis disputes that the leases "failed."  ECF No. 47 at 11.

3

(5:12cv627)

purchase of sub-Clinton leaseholds covering 6,036.21 net mineral acres and CC&J received $754,526.25 in contingent attorney fees.  ECF No. 46 at 6, ¶30.

During the closing on some of the conveyances, it was determined that Davis did not have proper title to some of the sub-Clinton leaseholds that were included in the conveyance. ECF No. 46 at 6, ¶31.  In such instances, Amarado did not pay the purchase price for the failed leases and CC&J did not request its contingent legal fee, although the failed leases remained listed in the assignment.  ECF No. 46 at 6-7, ¶31.

Additionally, on five separate occasions it was discovered that certain of Davis' leaseholds paid for by Amarado did not have sub-Clinton strata leasehold rights.  ECF No. 46 at 7, ¶32.  It was agreed by the parties that on each such occasion, a credit in Amarado's favor for the failed leases would be applied to the amount due Davis and CC&J for the next assignment.[3] ECF No. 46 at 7, ¶32.

In January 2012, after it had concluded inventorying all the failed leases, Amarado located 2,389 acres for which Amarado paid the purchase price of $1,000 per acre and contingent legal fees of $125.00 per acre that contained the Franklin defect.  ECF No. 46 at 7, ¶¶34, 35.  It requested that Davis provide for the customary adjustments for failed leases which, because all transfers had been made at such time and money paid, would need to come in the form of cash reimbursement.  ECF No. 46 at 7, ¶35.  Davis and CC&J refused to provide reimbursement by refund.  ECF No. 46 at 7-8, ¶35.  This action followed.

---

[3] Davis contends that this course of conduct described by Amarado providing for reimbursements was the course of conduct followed by the parties for leases Davis failed to hold by production, as expressly set forth in the June Letter.  ECF No. 75 at 5.

4

(5:12cv627)

## C. The Claims

Amarado commenced this action seeking recovery of the amount of payment for the leases containing the Franklin defect, $2,389,000.00, and the amount of payment for contingent attorney fees, $298,672.50. ECF No. 46 at 8, ¶36. The First Amended Complaint alleges seven counts against Davis: Count 1 breach of contract for (A) failure to return the purchase price on leases that could not be held by production, and (B) breach of established contractual course of conduct; Count 2 partial rescission of contract; Count 3 unjust enrichment; Count 6 estoppel; Count 9 fraud, and Count 10 breach of warranty and assignment covenants.[4] ECF No. 46 at 8-18.

Davis moves to dismiss all but one count (Count 1(A)) of the First Amended Complaint.[5] ECF No. 47.

## II.  Legal Standard

In deciding a motion to dismiss pursuant to Fed. R. Civ. Pro. 12(b)(6), the Court must take all well-pleaded allegations in the complaint as true and construe those allegations in a light most favorable to the plaintiff. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citations omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as

---

[4] The First Amended Complaint also alleges some of the above-mentioned counts and additional counts against CC&J and/or Attorney Plumly for: full rescission of contract (Count 4); unjust enrichment (Count 5); legal malpractice (Count 7); and breach of fiduciary duty (Count 8). ECF No. 46 at 8-18.

[5] Count 1(A) refers to the contract provision that Davis "will extend, renew or produce for a minimum of a 5 years term on all acreage confirmed and delivered to" Amarado and, "[s]hould [Davis] be unable to maintain any lease . . . he would return the $1,000" to Amarado. ECF Nos. 46-1 at 1; 46 at 8. Amarado argues in Count 1(A) that failed leases should have been reimbursed as expressly noted in the contract because they could not be maintained. ECF No. 66 at 11-12.

(5:12cv627)

true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.  When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id*. at 679.  The factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citing authorities).

In other words, claims set forth in a complaint must be plausible, rather than conceivable. *Twombly*, 550 U.S. at 570.  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'show[n]' — 'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (citing Fed. R. Civ. Pro. 8(a)(2)). In addition to reviewing the claims set forth in the complaint, a court may also consider exhibits, public records, and items appearing in the record of the case as long as the items are referenced in the complaint and are central to the claims contained therein. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

### III.  Discussion

### A.  Count 1—Breach of Contract (B) Breach of Established Contractual Course of Conduct

The parties agree that the written contract consists of three letter agreements dated June 15, 2011; July 27, 2011; and September 1, 2011.  ECF No. 46 at 9 ¶46; 47 at 10.  In the complaint, Amarado alleges that the contract is also defined, in addition to the three letters, as:

a course of conduct and dealing consistent with the contract whereby: a) purchase

6

(5:12cv627)

> price for acreage in which the Davis Defendants did not have proper title was not
> paid for by agreement of Davis Defendants and Amarado, nor were attorney fees
> paid to CCJ by agreement of Amarado and CCJ; and b) until the current dispute,
> any money paid for leaseholds which failed to convey Sub-Clinton HBP rights
> and which could not be cured, or to which the Davis Defendants could not
> maintain or extend, would be reimbursed through credits made against future
> purchase price payments and against the future contingent attorney fees,
> respectfully.

ECF No. 46 at 9, ¶46.[6]

To establish a claim for breach of contract pursuant to Ohio law, a plaintiff must establish

the existence of a contract, performance by the plaintiff, the defendant's failure to fulfill its

contractual obligations, and damages as a result of the breach. *See Pavlovich v. Nat'l City Bank,*

*435 F.3d 560, 565 (6th Cir. 2006)* (citing *Wauseon Plaza Ltd. P'ship v. Wauseon Hardware Co.*,

807 N.E.2d 953, 957 (Ohio Ct. App. 2004)).

Davis agrees that the written contract expressly provides for reimbursement of funds for

leases Davis fails to maintain during a five year period. ECF Nos. 75 at 3; 46-1 at 1. Davis

points out, however, that the contract does not expressly provide for reimbursement of funds for

leases that have a title defect. ECF No. 75 at 3-4. Therefore, Davis argues, any course of

conduct alleged by Amarado reflecting reimbursement for failed leases is characterized as an

unwritten modification of the contract, and the statute of frauds requires contract modifications to

---

[6] Amarado, in its brief in opposition, sometimes refers to the contract as the three letters,
the course of performance, *and* the individual lease assignments. ECF No. 66 at 14 (referring to
"written provisions of the Letter Agreements and the Assignments."). Because the First
Amended Complaint clearly defines the "Contract" in Count 1(B) as the three letters and the
course of performance, and the bulk of Amarado's breach of contract argument is directed at
such, the Court takes Amarado at its word and considers the written contract to be the three
letters.

(5:12cv627)

be in writing.  ECF No. 47 at 16-18.

Amarado does not dispute that the statute of frauds applies to the instant contract.[6] Rather, it claims that the "course of dealing refunding the monies paid for failed acreage was consistent with and confirmed the written modifications of the September 1, 2011 letter agreement."  ECF No. 66 at 13 (emphasis omitted).  Amarado provides two explanations for how Davis breached the written modifications in the September letter: (1) that the use of the word "conveyed" modified the previous June letter, which used the word "confirmed"; and (2) the true meaning of the "Final Determination Date."  ECF No. 66 at 15.

### 1.  "Confirmed" Versus "Conveyed"

The parties agree the September 1, 2011 letter modified the two prior letters.  ECF Nos. 66 at 12; 75 at 7; 46-1 at 3.[7]  Amarado argues that the September letter referring to acres "conveyed" modified the June letter referring to acres "confirmed" in such a way that "eliminated risk" to Amarado.  ECF No. 66 at 13, 25.

The June letter states, in pertinent part,

30 days after confirmation of leasehold acres capable of Horizontal Drilling, [Amarado] will pay [Davis] $1000/Net Mineral Acre for each confirmed acre.
. . . .
Subject to a mutually agreeable form of assignment without warranties of title ([Amarado] having done the title research) by [Davis]
. . . .

_____

[6]  In response to Davis' statute of frauds argument, Amarado states that it "has never alleged the course of dealing modified the Contract."  ECF No. 66 at 14.

[7]  The September letter reads, "[t]he parties agree that the letter agreements dated June 15, 2011. . . and the exercise of that option dated July 27, 2011 ("Previous Agreements") are hereby modified as follows. . ."  ECF No. 46-1 at 3.

8

(5:12cv627)

> [Amarado] will purchase any confirmed leasehold acreage which has been confirmed to hold a clear title.

ECF No. 46-1, pt. 3, 12.  The September letter reads, in pertinent part,

> For each net acre conveyed to [Amarado] in addition to One Thousand Dollars ($1,000.00) per mineral acre to be paid to [Davis], [Amarado] shall pay to CC&J the sum of One Hundred Twenty-Five Dollars ($125.00) per net acre for CC&J's assistance on behalf of [Davis] in performing title curative work and other services related to the conveyance of the partial assignment of Leases from [Davis] to [Amarado].

ECF No. 46-1 at 3-4, ¶4.

Amarado argues that the June letter obliging it to pay $1,000 for each acre "confirmed" to hold clear title was modified in the September letter to require it to pay $1,000 for each acre "conveyed." ECF No. 66 at 13.  It argues that the change in wording modified the risk the parties bore under the entire contract.  ECF No. 66 at 25.  This argument fails for a number of reasons.

A plain reading of the letters does not support Amarado's somewhat baroque interpretation of the September modification.  For example, the June letter states that Amarado will purchase  leaseholds confirmed to hold a clear title.  ECF No. 46-1 at 12.  The September letter, drafted in response to Amarado's concerns about title matters, provides that CC&J will provide it "reasonable assistance" to address those concerns and, in exchange, will be paid $125.00 "for each net acre conveyed."  ECF No. 46-1 at 3, ¶¶1, 2, 4.  The words "for each net acre conveyed" does not "eliminate the requirement of 'confirmation of clear title'" as Amarado suggests.  ECF No. 66 at 13.

Amarado makes much ado about the word "convey," but beyond repeatedly italicizing the word it does not explain what significance it attaches to that word.  For example, it states that,

9

(5:12cv627)

> [i]n the frenzy of the various closings, payment was sometimes made for Sub-Clinton Leasehold acreage that, for various reasons, did not *convey*.  When this came to the parties' attention, Davis Defendants and CCJ honored the written terms of the September 1, 2011 letter agreement by refunding payment for Sub-Clinton Leasehold acres that did not *convey*.  By performing the Contract in this manner, all the Defendants maintained compliance with i) the written provision requiring payment for only Sub-Clinton Leasehold acres *conveyed*, . . .

ECF No. 66 at 13 (emphasis in original).  Italicized words alone do not demonstrate what meaning Amarado attaches to the word "convey" and how it changes the plain reading of the contract.  Notably, the contract does not provide for a return of payment for leases with a failed title.

To the extent Amarado is arguing that because the title was allegedly deficient a conveyance did not occur, such an argument is unpersuasive.  The June letter places the duty on Amarado to confirm proper title.  ECF No. 46-1 at 1.  Amarado agrees that the June letter, specifically bullet point 3, places the duty on it to confirm proper title.  ECF No. 66 at 25 (referring to the June letter, Amarado states, "[c]onfirmed acres were acres Amarado would have confirmed as containing acceptable title.  Under such a provision Amarado would have the risk of failure of title and there would be no warranty provided by the Davis Defendants.").  The September modification did not eliminate this risk to Amarado.  Rather, the stated purpose of the September letter was to assist Amarado in its "concerns regarding title issues"; the letter caused CC&J to assist it to that end; and the letter provided a payment scheme to CC&J for such work.  ECF No 46-1 at 3.  Amarado's argument that the September letter eliminated the duty of confirming title that was previously and expressly placed upon it while at the same time creating a mechanism for assisting it in efforts to perform that duty is nonsensical.

10

(5:12cv627)

## 2.  The Final Determination Date

The September letter reads,

> [Amarado] shall provide to [Davis] written notice accepting or rejecting each Lease on or before December 31, 2011 ("Final Determination Date").  As of the Final Determination Date if [Davis] has not received the notice called for in this paragraph 5, any Lease not previously accepted or rejected by [Amarado] shall be deemed rejected and to any rejected Lease shall be free and clear of any obligations or claims of [Amarado].

ECF No. 46-1 at 4, ¶5.

Amarado declares this provision means "a date by which Amarado had to accept or reject a lease, otherwise the lease could be re-marketed free and clear of the Contract." ECF No. 66 at 15.  Amarado objects to Davis' reading of the provision, which it characterizes as being "the last possible date Plaintiff was able to receive a refund for any failed leases." ECF No. 66 at 15.  Amarado goes on to argue that "Paragraph 5 does not say this.  Indeed, nowhere in any of the letter agreements or the assignments does it state that the Final Determination Date is a cut-off date. . . preventing Amarado's claim for return of money for failed conveyance." ECF No. 66 at 15 (emphasis omitted).  The Court agrees that nowhere in any of the letter agreements does it indicate the Final Determination Date refers to the time by which Amarado must seek a claim for return of money for failed leases.  This does not help Amarado's position, however.  As noted, the letter agreements do not refer to a refund for failed leases.  The Court reads the provision at issue exactly as Amarado urges — it sets out the date by which Amarado had to accept or reject a lease.

Amarado purchased the allegedly failed leases prior to December 31, 2011— it accepted them.  *See, e.g.*, ECF No. 46 at 6, ¶¶29, 30, 34, 35.  It did not reject the leases prior to December

11

(5:12cv627)

31, 2011.  After that date, in January 2012, it "requested Davis provide for the customary

adjustments for failed acreage which . . . would at that time need to come in the form of cash

reimbursement."  ECF No. 46 at 7, ¶35.  In essence, Amarado was attempting to reject the leases

after it had already accepted them and after the prescribed date.  Thus, Davis did not breach the

contract when it did not permit Amarado to reject leases after December 31, 2011.

In sum, despite Amarado's assertion that, in Count 1(B), it alleges facts consistent with

the written terms of the contract (ECF No. 66 at 15), the Court finds that it has not done so.  As

such, Count 1(B) of the First Amended Complaint is dismissed.

### B.  Count 10— Breach of Warranty and Assignment Covenants

In Count 10, Amarado alleges that Davis breached the warranty and assignment

covenants when it transferred the leases that were later deemed by Amarado to be failed leases.

Amarado alleges that, "[w]ith each assignment, the Davis Defendants made warranty that they

had title to the leaseholds and were transferring good title to the same free and clear of all

encumbrances."  ECF No. 46 at 19, ¶104.  Thus, Amarado asserts, "the Davis Defendants

breached the warranty contained in the assignments."  ECF No. 46 at 19, ¶105.  Davis argues that

the assignments are "explicitly subject to the Contract," which provides that the assignments are

"without warranties of title ([Amarado] having done the title research)."  ECF Nos. 47 at 30; 46-

1 at 1.

In response, Amarado reasserts its prior argument that the September letter modified the

June letter by the use of the word "conveyed."  ECF No. 66 at 25.  This argument fails for the

same reasons explained above.

12

(5:12cv627)

Amarado also claims that Davis had "title curing obligations under the September 1, 2011 letter agreement."  ECF No. 66 at 26.  Amarado argues that the provision in the June letter stating "Optionee [Amarado] will cure all title defects and provide ratifications of all leases as required by Optionor [the Davis Defendants]" was a mistake, and that "the terms 'Optionee' and 'Optionor' were apparently inadvertently transposed."  ECF No. 66 at 26.  Thus, Amarado asserts, title responsibilities were on Davis per the September letter, and the warranty contained in the assignments should be read consistent with that responsibility.[8]  ECF No. 66 at 28.

In the First Amended Complaint, Amarado did not allege that a mistake had been made in reducing the agreement to writing.  Nor does the complaint refer to a letter allegedly written by Plumly to Amarado wherein Plumly allegedly admits that the terms were transposed, something Amarado refers to (for the first time) in its opposition brief.  *See* ECF No. 66 at 27.  Accordingly, Amarado not only fails to plead mistake with particularity, it fails to plead it at all, and the pleading requirement of Fed. R. Civ. Pro. 9(b) is not satisfied.  *See* *Apex Energy Group, LLC v. Apex Energy Solutions of Cincinnati, LLC*, 2013 WL 394464, at *6 (S.D. Ohio Jan. 31, 2013) (a typographical mistake in the agreement switching the parties' duties under the agreement is a "scrivener's error"; per Ohio law is considered a mutual mistake which must be pled with particularity; and arguing mistake for the first time in an opposition brief was insufficient, citing Fed. R. Civ. Pro. 9(b)); *see also* *ArcelorMittal Cleveland, Inc. v. Jewell Coke Co., L.P.*, 750 F.Supp.2d 839, 845 (N.D.Ohio 2010) (circumstances constituting mistake must be pled with

---

[8]  Although the alleged mistake was in the June letter, Amarado inexplicitly asserts Davis breached the terms of the September letter.  Either way, the argument is not properly pleaded.

13

(5:12cv627)

particularity to meet heightened Rule 9(b) requirements).

Amarado also argues that, because the letter agreements were for sub-Clinton leaseholds, and because Davis, in the assignments, reserved interest in the "Clinton and above strati and the existing wells," there is nothing left that Davis could have conveyed other than sub-Clinton interest.  ECF No. 66 at 31-33.  Because the parties intended to convey sub-Clinton leaseholds, Amarado asserts, the warranty in the assignments referred to the sub-Clinton rights and "warranted to Amarado . . . ownership of title and authority to convey . . .the Sub-Clinton Leasehold."  ECF No. 66 at 33.

There is no dispute that the interest intended to be conveyed was the sub-Clinton rights. Moreover, the assignments state,

> This assignment is subject to that certain Due Diligence Option Offer Contract Letter Agreement dated June 15, 2011 and modified on both July 27, 2011 and September 29, 2011, by and between Dean Davis, individually and as sole proprietor of Green Gas Company, Noble Gas Company, An Car Oil Company (also known as An Car Wells), S&D Producing and Davis Frac Tank & Supply and Amarado Oil Company, Ltd. known herein as the "Contract Letter Agreement" . . . .

> [The Davis Defendants] hereby covenants unto Assignee, Amarado Oil Company, Ltd. that they are the lawful owner of said Lease(s) and that they have good right and authority to sell and convey the same and that said Lease(s) are free and clear of all liens and encumbrances and that said Lease(s) are perpetuated by virtue of a producing well(s) thereon and that all rentals and royalties due and payable thereunder have been duly paid, and that the undersigned agrees to warrant and defend the same against the lawful claim and demands of all persons whomsoever, by, through and under Assignor, but not otherwise.

ECF No. 47-1 at 1-2.[9]  Davis argues that the covenant language "does not affirm [] that the leases

---

[9]  The Court may consider the assignments because they were referenced in the First Amended Complaint (*see, e.g.*, ECF No. 46 at 19) and submitted with Davis' Motion to Dismiss

(5:12cv627)

conveyed hold the rights to sub-Clinton strata.  Under the parties' agreement, it was Amarado's

obligation to discover whether the leases it selected were to convey the sub-Clinton strata, not

Davis's obligation to covenant that fact."  ECF No. 75 at 9.

    The parties agree that the June letter places the duty of title research on Amarado.  The

June letter also recites that the agreement is "[s]ubject to a mutually agreeable form of

assignment without warranties of title."  ECF No. 46-1 at 1.  The assignments, however,

covenant that Davis has "good right and authority to sell and convey" the leases, "free and clear

of all liens and encumbrances."  ECF No. 46-1 at 1.  Although Davis states what the assignment

allegedly does not covenant, it does not explain what the language does purport to covenant.  *See*

ECF No. 75 at 8 ( "the covenant language [in] the assignment does not affirm [] that the leases

conveyed hold the rights to sub-Clinton strata.").  Neither party attempts to explain how the

leases were conveyed without warranty of title per the June letter and seemingly carried over in

the July and September letters, yet the assignments, subject to those letters, clearly covenant

some type of warranty.  In short, neither party offers a convincing explanation for how to read

these two provisions together and consistent with one another despite urging the Court to do so.

ECF Nos. 66 at 8; 75 at 8-9.  Although contract interpretation is a matter of law, *see Blair v.*

*McDonagh*, 894 N.E.2d 377, 388 (Ohio Ct. App. 2008), the parties have not presented the Court

with sufficient arguments and supporting legal authority to make a determination as a matter of

law.

_____

(ECF No. 47-1).  *See Bassett*, 528 F.3d at 430.

15

(5:12cv627)

In the First Amended Complaint, Amarado alleges that the assignments contained a warranty that Davis "had title to the leaseholds and were transferring good title." ECF No. 46 at 19, ¶104. The assignments do not facially resist such an interpretation. Amarado alleges some leases contained the Franklin defect, thereby causing Davis to breach the assignment warranty. ECF No. 46 at 19, ¶105. Thus, Amarado has stated a claim for relief that is plausible. *See Iqbal*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). Davis' motion to dismiss the warranty claim is denied.

### C. Count 9—Fraud

In its allegations of fraud, Amarado alleges that a special relationship existed between it and Davis which created a duty in Davis to disclose material facts known regarding the title defect. ECF No. 46 at 18, ¶¶94-98. Amarado alleges that the "artifices employed to lure Amarado into a false sense of security in combination with the concealments and failures to disclose and pressures to close were done with an intent to mislead Amarado into a false sense of security that the leaseholds had marketable and acceptable titles." ECF No. 46 at 18, ¶99. Davis contends that it did not owe Amarado a duty outside the obligations in the contract, and, therefore, a fraud claim is unavailing. ECF No. 47 at 29.

"A party cannot allege a fraud claim arising from the same conduct that supports a breach of contract claim unless the fraud claim stems from a separate and independent duty unrelated to the parties' contractual obligations." *King v. Hertz Corp.*, 2011 WL 1297266, at *2-4 (N.D.Ohio Mar. 31, 2011) (citing *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 684 N.E.2d 1261, 1270

(5:12cv627)

(Oh. Ct. App. 1996)).  Amarado does not point to an independent duty unrelated to the

obligations created by the contract.  Instead, Amarado argues, in opposition, that "the nature of

the grievance in the instant case is fully explained in [the] complaint.  It involves the luring of

Amarado into accepting the offers to sell on each of the Failed Leases. . . . Such a cause of action

is fraud in the inducement."  ECF No. 66 at 23.

Davis contends that the First Amended Complaint does not allege "fraud caused

[Amarado] to execute or enter into any kind of agreement."  ECF No. 75 at 10.  Moreover, Davis

argues, Amarado asserts in its brief that the election of each lease is a separate contract, in

contrast to the complaint which specifically identified the contract as the three letters.  ECF No.

75 at 10.  Therefore, Davis argues, Amarado's "fraud claim, as it is characterized in its

Response," is not plead with particularity as required by Fed. R. Civ. Pro. 9(b).  ECF No. 75 at

11.

A review of the First Amended Complaint reveals allegations that fall short of asserting

that Davis' conduct induced Amarado to enter into the agreement.  Instead, the allegations hint at

rather than plead with particularity a fraudulent inducement claim, stating: that Davis concealed

material facts; "with knowledge of [] the false impressions they were sure to create in Amarado";

that "lure[d] Amarado into a false sense of security . . . with an intent to mislead Amarado [ ] that

the leaseholds had marketable [] titles"; "Amarado placed justifiable reliance upon those false

impressions"; and Amarado was damaged as a result.  ECF No. 46 at 18-19, ¶¶96-102.  Notably,

Amarado does not allege that Davis' acts caused it to enter into the agreement, or even that the

false sense of security allegedly created by Davis' acts caused it to enter into the agreement.

17

(5:12cv627)

Moreover, although the First Amended Complaint defines the contract as the three letters, in Amarado's response brief the contract metamorphoses into a number of "separate contracts to purchase each of the leaseholds." ECF No. 66 at 23. It is to these separate contracts that Amarado now argues it was induced to enter into. ECF No. 66 at 24. However, this is not evident in the First Amended Complaint. Rather, the fraud claim reads consistently with Amarado's definition of the contract as the three letters— in other words, Amarado appears to allege that it was fraudulently induced to enter into the three letter agreements. *See* ECF No. 46 at 18-19. The fraud section does not allege Amarado was fraudulently induced to enter into a number of separate contracts to purchase each of the leaseholds. Accordingly, Amarado has failed to plead its fraud claim with particularity, and Count 9 is dismissed.[10]

### D. Count 2—Partial Rescission of Contract

In Count 2, Amarado alleges that, because some leases had failed titles, "Davis Defendants were unable to convey what they did not own thereby causing a complete failure of consideration for each" failed lease. ECF No. 46 at 10, ¶53. As such, Amarado contends, it is "entitled to partial rescission of the contract with the Davis Defendants and return of the money paid for the Failed Leases plus interest." ECF No. 46 at 11, ¶54.

---

[10]  Although Amarado argues in opposition that Davis "worked to conceal and divert attention from the defective nature of the Failed Leaseholds and lure, induce and defraud Amarado into accepting the offers of sale as opposed to rejecting[] them," Amarado also alleges in the First Amended Complaint, and argues in opposition, that it had previously purchased, under the same circumstances, leases with a title defect which Davis credited on Amarado's next purchase. *See* ECF Nos. 66 at 24, 13; 46 at 7, ¶32. It is not clear how Amarado was fraudulently induced to accept the failed leases in question when it had previous experience purchasing failed leases.

(5:12cv627)

Davis argues that rescission is not a separate cause of action, but an equitable remedy, and that Count 2, therefore, fails to state a claim.  ECF No. 47 at 19.  Amarado responds that "partial rescission of contract should be recognized as appropriately sought . . . as an alternative remedy for its allegations related to [its other claims]."  ECF No. 66 at 16.  Amarado urges the Court to "recognize [its] request for partial rescission based upon breach of contract due to a complete failure of consideration or bad faith."  ECF No. 66 at 17.

Although rescission is an equitable remedy, a plaintiff may bring a claim for rescission on the grounds that the contract was procured by fraud or bad faith.  *See Cross v. Ledford*, 120 N.E.2d 118, 119 (Ohio 1954); *Hardy v. Midland Enterprises, Inc.*, 66 Fed. App'x 535, 540 (6th Cir. 2003).  A failure of consideration alone is not enough to support a claim for rescission.  *Anchor v. O'Toole*, 94 F.3d 1014, 1025 (6th Cir. 1996) (noting that, regarding a deed conveying real estate, "mere failure of consideration, . . . when unmingled with fraud or bad faith, is not sufficient in equity to warrant the rescission of an executed contract," quoting *Gem Sav. Assoc. v. Edwards*, 1987 WL 18199, at *4 (Oh. Ct. App. Oct. 6, 1987)).  Amarado, in its First Amended Complaint, alleges only that there was "a complete failure of consideration."  ECF No. 46 at 10, ¶ 53.  Likewise, in its opposition brief, Amarado asserts that "Count II is a request for rescission and return of money paid based upon a breach of contract due to the complete failure of consideration related to the Failed Sub-Clinton Leaseholds."  ECF No. 66 at 16.  Thus, to the extent Amarado alleges a rescission claim for the failure of consideration, such a claim is unavailable.

Amarado, in its opposition brief, also states that "[f]ailure of consideration is grounds for

19

(5:12cv627)

rescission under Ohio law when the contract contains a forfeiture provision requiring the return of the money or other consideration given." ECF No. 66 at 16 (citing *Anchor*).  Presumably, Amarado is referring to the provision in the June letter that provides for reimbursement if Davis fails to maintain the lease, which is the argument advanced in Count 1(A).  Although Davis states that the partial rescission claim should be dismissed because "Amarado's claims for breach of contract . . . should be dismissed" (ECF No. 75 at 14), the Court notes that Davis has moved for the dismissal of Count 1(B) only.  Because the briefing before the Court is inadequate as it pertains to a claim for rescission as an alternative remedy or theory on Count 1(A), the Court is unwilling to dismiss the partial rescission claim in its entirety.

### E.  Count 3—Unjust Enrichment

Amarado also alleges an unjust enrichment claim.  Davis argues that this claim is unavailable because it may only be brought in the absence of an express written contract governing the parties' relationship, and the parties agree there is a written contract governing their agreement.  ECF No. 47 at 20.  Amarado contends that it is alleging it was fraudulently induced to enter into the "contracts" and, therefore, the contract is in dispute and an unjust enrichment claim is properly asserted.  ECF No. 66 at 20.

A claim for unjust enrichment

arises out of a contract implied in law.  *Hummel v. Hummel*, 133 Ohio St. 520, 14 N.E.2d 923, 925–26 (1938).  A "contract implied in law" is not a true contract, but is a "quasi-contract" implied by a court when a party "retains money or benefits which in justice and equity belong to another." *Id.* at 926–27.  Ohio law does not allow parties to "seek damages under quasi-contractual theories of recovery" such as a claim of unjust enrichment when a contract governs the relationship.  *Davis & Tatera, Inc. v. Gray–Syracuse, Inc.*, 796 F.Supp. 1078, 1085 (S.D.Ohio 1992).  Recovery under an unjust enrichment theory is precluded

20

(5:12cv627)

because the terms of the agreement define the parties' relationship.  *Wolfer Ent., Inc. v. Overbrook Dev. Corp.*, 132 Ohio App.3d 353, 724 N.E.2d 1251, 1253 (1999).  A claim for unjust enrichment may be pled in the alternative, however, when the existence of an express contract is in dispute and may be maintained despite the existence of an express contract where there is evidence of fraud, bad faith, or illegality.  *Resource Title Agency, Inc. v. Morreale Real Estate Services, Inc.*, 314 F.Supp.2d 763, 772 (N.D.Ohio 2004).

*Gascho v. Global Fitness Holdings, LLC*, 863 F.Supp.2d 677, 699 (S.D.Ohio 2012).

To the extent Amarado asserts an unjust enrichment claim on the basis of fraudulent inducement (*see* ECF No. 66 at 20), it has not done so with particularity, as noted, *supra*.  Here, as in its arguments pertaining to fraud, Amarado changes the identity of the contract.  It now asserts that "[s]eparate contracts under the terms of the three letters were thus created with respect to each of the Sub-Clinton Leaseholds when they were accepted or rejected." ECF No. 66 at 20.  It is as to these new contracts that Amarado argues it was fraudulently induced to enter, despite clearly defining the written contract in the First Amended Complaint as the three letters. ECF No. 66 at 20.  Moreover, although Amarado is correct in that a plaintiff may plead alternative and inconsistent causes of action (ECF No. 66 at 17),[11] the rule refers to pleadings— it does not permit assertions in response to a motion to dismiss to be alternative and inconsistent with those alleged in the complaint.  *See* Fed. R. Civ. Pro. 8(d)(2).

Furthermore, Amarado's attempt to align its argument with the winning argument in *Gascho* is unsuccessful.  In *Gascho*, the court allowed an unjust enrichment claim to proceed on

---

[11]  Amarado cites to "Fed. R. Civ. Pro. 8(E)(3)," but the text it quotes is from Rule 8(E)(3) of the Ohio Rules of Civil Procedure.  A federal court sitting in diversity applies federal rules of civil procedure.  *See First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 528 (6th Cir. 2002) (citing *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938)).

(5:12cv627)

a motion for judgment on the pleadings because the unjust enrichment claim was not "contingent on the existence of a contract between the parties." 863 F.Supp.2d at 700.  The plaintiffs alleged that they permitted the defendants to deduct money from their bank accounts consistent with their personal training contracts but that the defendants, "'contrary to their agreement' . . . deducted money 'without any basis in the contracts or any agreement from' plaintiffs." *Id.* at 699-700. Additionally, the *Gascho* plaintiffs alleged they were fraudulently induced into entering the contracts. *Id.* at 700.  As already noted, Amarado has not sufficiently alleged fraud in the inducement, nor does it allege that Davis' actions were done without any basis in the contract.[12]

In sum, because Amarado agrees that a contract exists and has not pleaded a viable fraud in the inducement claim, Count 3 is dismissed.

### F.  Count 6—Promissory Estoppel

Amarado states that, "[u]pon consideration of the Davis Defendants' arguments that promissory estoppel is not available where a written contract covers the matters at issue, [it] will seek leave to remove this Count from its causes of action." ECF No. 66 at 22.  However, it has not yet sought such permission.  Accordingly, the Court grants Davis' motion to dismiss Count 6.

---

[12]  Amarado did not allege "bad faith" in its complaint, and its assertions of bad faith in its opposition brief refer to acts of Plumly and CC&J.  *See* ECF No. 66 at 21 (*e.g.* stating that "Plumly and CCJ . . . le[]d Amarado into an acceptance of the offers to sell"; "failed to disclose where a duty of disclosure existed"; "obfuscated the transaction through CCJ's dual representation of the parties in violation of its ethical responsibilities"; and "artifices and bad faith that further obscured . . . CCJ's intent to remain loyal only to Davis Defendants while silently abandoning fiduciary duty to Amarado.").  As previously noted, Amarado does not identify an independent duty on the part of Davis to support a bad faith claim.  Moreover, only Davis has moved to dismiss Count 3, and any alleged bad faith against CC&J or Plumly would be encompassed in the unjust enrichment claim asserted against them in Count 5.

(5:12cv627)

## IV.  Conclusion

For the reasons stated above, the Court grants Davis' Motion to Dismiss (ECF No. 47) in part and denies it in part.

The case will proceed against Davis on Count 1(A) and Count 2 as it relates to Count 1(A), in addition to Count 10, breach of warranty.

IT IS SO ORDERED.

 September 17, 2013                          */s/ Benita Y. Pearson*
Date                                        Benita Y. Pearson
                                            United States District Judge

23